# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 19, 2025

Lyle W. Cayce
Clerk

No. 24-50788

_____

LIA Network, *also known as* Liberty In Action; Terri Hall; Rachel Vickers,

*Plaintiffs—Appellants/Cross-Appellees*,

*versus*

City of Kerrville, Texas,

*Defendant—Appellee/Cross-Appellant*.

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:24-CV-403

_____

Before Davis, Stewart, and Ramirez, *Circuit Judges*.

W. Eugene Davis, *Circuit Judge*:

A grassroots citizen advocacy group and two of its members brought this First Amendment suit challenging five provisions of a city Ordinance that regulates "Canvassing" and "Soliciting." They requested a preliminary injunction, which the district court granted as to one provision but denied as to the remaining four. We AFFIRM in part, REVERSE in part, and REMAND to the district court.

No. 24-50788

## I. Background

On March 26, 2024, Defendant–Appellee/Cross Appellant, the City of Kerrville, Texas, passed an Ordinance regulating the activity of "Canvassers" and "Solicitors." These two terms are defined in ways central to the arguments on appeal:

> *Canvasser* means a person who attempts to make personal contact with a resident at his or her residence without prior specific invitation . . . **for the primary purpose of attempting to enlist support for or against a particular religion, philosophy, ideology, political party, issue, or candidate**, even if incidental to such purpose the canvasser accepts the donation for money[.]

> *Solicitor* means a person who attempts to make personal contact with a resident at his or her residence without prior specific invitation . . . for the primary purpose of taking or attempting to take orders for the sale of goods. . . . [or] for the primary purpose of requesting a contribution of funds or anything of value, or selling goods or services. . . . Distributing a handbill or flyer advertising a service, requesting a contribution of funds or anything of value, **advertising services for educational, political, charitable, religious, or other purposes**, is considered a "solicitor."

The Ordinance goes on to list five restrictions based on these definitions, punishable by fines of between $50 and $500 per hour of violation.

Two of the restrictions apply to Canvassers and Solicitors alike. *First*, Section 30-179 prohibits Canvassing and Soliciting "at residences between the hours of 8:00 p.m. and 8:00 a.m." (the Hours Provision). *Second*, Section 30-180 states that Canvassing and Soliciting are unlawful at private properties affixed with a "sign bearing the words 'No Solicitors,' 'No Trespassing,' or words of similar intent" (the Signs Provision).

2

No. 24-50788

The remaining restrictions apply only to Solicitors. The *third* provision, Section 30-183, prohibits Soliciting "within the streets, street rights-of-way, or medians of the City" (the Streets Provision). *Fourth*, Section 30-182 prohibits Soliciting "within the City without first obtaining a permit issued by the City Manager" (the Permitting Provision). To obtain a permit from the City Manager, applicants must pay a fee and undergo fingerprinting and a background check. *Fifth*, Section 30-185 provides that it is "unlawful for any person under the age of 18" to Solicit unless a "sponsoring person, company, or organization" obtains a permit (the "Minor Permitting Provision").

Plaintiffs–Appellants/Cross-Appellees, Liberty in Action Network (LIA), Terri Hall, and Rachel Vickers, brought the instant suit challenging the Ordinance. LIA is a "501(c)(4) nonprofit corporation based in Kerrville, Texas which engages in citizen advocacy." LIA has no "formal members" besides its seven directors, but "supports a network of 80–100 individuals who regularly attend its meetings and has approximately 481 subscribers who subscribe to its emails." The organization "seeks to provide voters with information about upcoming local elections" by deploying volunteers to canvass residential neighborhoods and city streets and medians. Volunteer canvassers "speak with citizens on issues of public importance, provide literature on issues of public importance, and ask for donations." Since the City's passage of the Ordinance, LIA alleges that past volunteers "have informed the organization they are chilled in engaging in future canvassing" because they are uncertain as to "what they can and cannot do and say" and fear imposition of fines.

Plaintiff Terri Hall is a co-founder and director of LIA and involved with "other religious and charitable causes." She submitted an affidavit asserting she frequently engages in activities now banned by the Ordinance. First, as to the Hours Provision, she and other LIA volunteers regularly

3

canvass after 8:00 p.m. They find this is a "critically valuable time for canvassing" because "the best time to engage with our neighbors is when they are at home, after they have finished dinner." Second, as to the Signs Provision, Hall and other LIA volunteers have canvassed homes with "No Soliciting" and "No Trespassing" signs and "had positive interactions with the homeowners," who did not view their activity as violative of their signage. Third, as to the Streets Provision, Hall engages in "street evangelism" and "pamphleteering," as well as "fundraising that involves holding signs" for LIA and other organizations in the streets and medians. Fourth, as to the Permitting Provision, she often goes door-to-door and requests donations for LIA, "sometimes as the primary reason for the interaction," and objects to the City's permitting regime. Finally, as to the Minor Permitting Provision, Hall's children regularly solicit door-to-door for "4-H clubs" and "scout troops" and she "would like for [her] children to be free to continue." Overall, Hall plans to continue all this activity in the future but fears prosecution under the Ordinance.

Plaintiff Rachel Vickers is a "politically engaged resident of Kerrville and volunteer" with LIA. She too submitted an affidavit regarding her activity. Like Hall, she would like to continue canvassing homes with "No Soliciting" signs. Vickers also owns a business, "Just Windows," which she markets by knocking on doors and handing out business cards. She wants to continue this activity without complying with the Permitting Provision.

Plaintiffs sued under 42 U.S.C. § 1983, arguing the Ordinance restricts their free speech in violation of the First and Fourteenth

No. 24-50788

Amendments.[1] They bring both as-applied and facial constitutional challenges as to all five provisions.[2]

Plaintiffs moved for a preliminary injunction. The district court held a hearing and ultimately issued an opinion partially granting the motion. Preliminarily, the court found Plaintiffs have standing as to all provisions except the Minor Permitting Provision. On the merits, the district court enjoined the City from implementing the Permitting Provision but declined to enjoin it from enforcing the Hours, Signs, and Streets Provisions. Both sides timely appealed.

## II. Standing

We begin with standing. To have Article III standing, a plaintiff must show that they "(1) suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury."[3] Here, the City disputes only the first element, injury-in-fact. The parties agree that the Ordinance has not yet been enforced against Plaintiffs, so they have not suffered injury through a fine. But in the First Amendment context, pre-enforcement challenges are viable: merely "chilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact

---

[1] Plaintiffs also challenged a second Ordinance regulating "electioneering" activity. However, based on the City's repeal of that Ordinance, a motions panel of this Court has already dismissed that portion of this appeal as moot.

[2] The City argues, for the first time on appeal, that Plaintiffs can only mount facial challenges because the Ordinance has not yet been enforced against them. The City has waived this argument by failing to present it to the district court. Moreover, the argument is meritless because, as will be seen, we allow a plaintiff to bring an "as-applied pre-enforcement challenge." *See Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 926 (5th Cir. 2023).

[3] *Hou. Chron. Publ'g Co. v. City of League City*, 488 F.3d 613, 617 (5th Cir. 2007).

requirement."[4] To establish such injury, a plaintiff must show "(1) an intention to engage in a course of conduct arguably affected with a constitutional interest, (2) his intended future conduct is arguably proscribed by the policy in question and (3) the threat of future enforcement of the challenged policies is substantial."[5]

### A. *Standing for the Hours, Signs, Streets, and Permitting Provisions*

The district court found (1) LIA and Hall have standing to challenge the Hours, Signs, Streets, and Permitting Provisions and (2) Vickers has standing to challenge the Signs and Permitting Provisions. We agree.

As to the first element of injury-in-fact, Plaintiffs have shown their "intention to engage" in activities "arguably affected with a constitutional interest."[6] All Plaintiffs intend to politically canvass door-to-door. Hall and LIA intend to fundraise for LIA in the streets and medians, as well as door-to-door. Hall wants to engage in "street evangelism." And finally, Vickers plans to advertise her business. All these activities are afforded First Amendment protection.[7]

---

[4] *Speech First, Inc. v. Fenves*, 979 F.3d 319, 331 (5th Cir. 2020), as revised (Oct. 30, 2020) ("It is not hard to sustain standing for a pre-enforcement challenge in the highly sensitive area of public regulations governing bedrock political speech."); *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (A plaintiff need not "expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights.").

[5] *Speech First*, 979 F.3d at 330 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161–64 (2014)) (cleaned up).

[6] *Id.*

[7] *See Wis. Action Coal. v. City of Kenosha*, 767 F.2d 1248, 1251 (7th Cir. 1985) ("In a line of cases running over some twenty-five years, the Supreme Court has granted substantial First Amendment protection to door-to-door canvassing and soliciting activities."); *Parks v. City of Columbus*, 395 F.3d 643, 647–48 (6th Cir. 2005) ("[B]y distributing literature, displaying a religious message, and preaching to those interested,

No. 24-50788

As to the second element, Plaintiffs' proposed conduct is more than "arguably" proscribed by the various provisions of the Ordinance. Unlike other cases, where the connection between the conduct and regulation was more attenuated,[8] Plaintiffs' proposed activities fit precisely the conduct targeted here. Regarding Plaintiffs Hall and LIA, Hall attested that she and other LIA volunteers intend to engage in Canvassing and Soliciting activities restricted by the Hours, Signs, Streets, and Permitting Provisions.[9] Plaintiff Vickers submitted a similar affidavit confirming her intention to violate the Signs and Permitting Provisions.[10] Plaintiffs' conduct is proscribed by these provisions, respectively, satisfying the second element.

The third element of injury—the threat of future enforcement—presents the closest question. For an as-applied challenge,[11] "[t]here must be

_____

[Plaintiff] was engaging in religious activity that has been recognized as protected speech under the First Amendment."); *Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 980 (10th Cir. 2020) ("[D]oor-to-door commercial solicitation implicates the First Amendment.").

[8] *See, e.g.*, *Woodlands Pride, Inc. v. Paxton*, 157 F.4th 775, 783–86 (5th Cir. 2025) (performing a fact-intensive analysis to determine whether the plaintiffs' proposed drag shows would constitute "sexually oriented performances" so as to be "arguably proscribed" by the statute at issue).

[9] Specifically, Hall and other LIA volunteers (1) "would like to talk to friends, family, and neighbors about religion, philosophy, ideology, political parties, issues, and candidates after 8 p.m." in violation of the Hours Provision; (2) "would like to canvass at private property in the city of Kerrville that ha[s] 'no soliciting,' 'no trespassing,' and signs with 'words of similar intent'" in violation of the Signs Provision; (3) "would like to engage in solicitation activity" on "streets, medians, street rights of ways" in violation of the Streets Provision; and (4) "would like to knock on doors to ask for donations for LIA without applying for a permit" in violation of the Permitting Provision.

[10] Vickers does not aver an intent to violate the Hours or Streets Provision, so she has no standing to challenge those provisions.

[11] As explained below, we never reach or consider Plaintiffs' facial challenge. So, we apply the more demanding threat-of-enforcement test applicable to as-applied challenges. *See Speech First*, 979 F.3d at 335 (explaining that courts assessing the threat of

some evidence that [a] rule would be applied to the plaintiff" to establish a sufficient threat of enforcement for injury purposes.[12] We frequently look to two kinds of evidence. First, we consider enforcement of the regulation at issue against a person similarly situated to the plaintiff.[13] Second, we consider whether the defendant has disavowed enforcement against the plaintiff.[14]

Here, the first category of evidence is lacking: there is no record evidence suggesting the City has pursued enforcement actions against others. But at "earlier stages of litigation," such as a preliminary injunction, "the manner and degree of evidence required to show standing is less than at later stages."[15] And the record contains the second type of evidence we previously have found persuasive: the City has not disavowed enforcement against Plaintiffs. Rather, counsel for the City affirmed at oral argument that the City considers Plaintiffs' planned activity on behalf of LIA "to be Canvassing." Counsel waffled on whether Plaintiffs are regulated "Solicitors" when they

---

future enforcement for standing may "assume" a credible threat of enforcement for facial challenges, but not for as-applied challenges).

[12] *Id.* (quoting *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 766–70 (6th Cir. 2019)).

[13] *See Braidwood*, 70 F.4th at 927 (pointing to "one action" against a similarly situated person as evidence of a threat); *Umphress v. Hall*, 133 F.4th 455, 465 (5th Cir. 2025) ("[Plaintiff] has alleged an intent to engage in the same speech and expressive conduct that was the subject of a prior enforcement proceeding." (quoting *Susan B. Anthony List*, 573 U.S. at 166) (cleaned up)).

[14] *See Braidwood*, 70 F.4th at 927 ("[T]he EEOC refuses to declare affirmatively that it will not enforce Title VII against the plaintiffs' policies."); *Umphress*, 133 F.4th at 466 (citing the defendant's "striking refusal to disavow future enforcement" against the plaintiff as strong evidence of a threat); *Barilla v. City of Houston*, 13 F.4th 427, 433 (5th Cir. 2021) (finding a sufficient injury in an as-applied case and observing that "the City did not disclaim its intent to enforce the Busking Ordinances to the district court, in its appellate briefing, or during oral argument, and instead stressed the Ordinances' legitimacy and necessity.").

[15] *Speech First*, 979 F.3d at 331.

approach people's homes or stand on the streets with the primary purpose of fundraising for LIA.[16] As to Vickers, counsel confirmed her door-to-door activity promoting her business qualifies as "Soliciting."[17] Overall, the City's "refusal to disavow future enforcement" against Plaintiffs throughout this litigation is "striking" and supports a finding of a threat.[18]

Moreover, we note that the closer the fit between a plaintiff's intended conduct and the sweep of the statute, the less plaintiff-specific evidence of a threat of enforcement is necessary. For example, in *Braidwood Management, Inc. v. EEOC*, we found persuasive that the defendant did not "seriously contest" that the plaintiffs' proposed activity, refusal to hire LGBTQ employees, was in direct violation of the federal employment law and guidance they were challenging.[19] Based on this fit, we observed that "[w]ithout resolution, potential penalties hang over plaintiffs' heads like Damocles' sword."[20] The same is true here. Plaintiffs wish to Canvass and Solicit in violation of an Ordinance that specifically—and singularly—targets such conduct. Simply put, this is not a case where Plaintiffs' fear of enforcement is speculative or overcautious. Accordingly, we find that Plaintiffs have demonstrated a "credible threat" of enforcement and are reasonably chilled so as to establish injury.[21]

---

[16] Counsel stated, "I don't want to admit that they are Soliciting necessarily."

[17] When asked by the Court, "As to Ms. Vickers, if she wanted to solicit in the afternoon, she would need a permit to do that?" counsel replied, "Yes."

[18] *Umphress*, 133 F.4th at 466.

[19] 70 F.4th at 926 ("Plaintiffs' credible-threat analysis is quite simple. First, they admit they are breaking EEOC guidance, which the EEOC does not seriously contest.").

[20] *Id.* at 928.

[21] *See Susan B. Anthony List*, 573 U.S. at 159.

No. 24-50788

The other prongs of standing—causation and redressability—are easily satisfied. Threatened enforcement has *caused* Plaintiffs' injuries by chilling their speech, and these injuries could be *redressed* by enjoining enforcement.[22]

The City's arguments that Plaintiffs lack standing are unpersuasive. First, the City claims the district court abdicated to this Court the standing determination. It points to the preliminary-injunction hearing where the district court stated: "So on the standing I'm going to be extremely liberally granting plaintiffs an argument that they have standing just to get us moving because this will just go up to the Fifth Circuit and they can decide whether your plaintiffs have standing or not." But the district court later entered a written order and dedicated five pages to a substantive standing analysis, citing much of the case law described above. The district court did not err on this ground.

Second, the City argues the district court erred in finding LIA is a proper plaintiff. It notes that LIA is a 501(c)(4) entity and alleges that such organizations are prohibited from engaging in political activity. But the City has misread its own authorities: they do not stand for the proposition that 501(c)(4) corporations are categorically banned from political activities,[23] nor

---

[22] *See Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006) ("The causation and redressability prongs of the standing inquiry are easily satisfied here. Potential enforcement of the statute caused the Center's self-censorship, and the injury could be redressed by enjoining enforcement of the [statute].").

[23] The Audit Technique Guide on which the City relies explains that, although political activity cannot be the "primary purpose" of the corporation's activity, a "501(c)(4) organization may intervene in political campaigns without jeopardizing its exempt status if it's primarily engaged in other activities which further the promotion of social welfare." Likewise, the case cited by the City, *Freedom Path, Inc. v. IRS*, analyzes an IRS "revenue ruling" that specified tax consequences for political-advocacy expenditures.

is such statement accurate.[24] The City also "questioned" before the district court whether LIA's board authorized filing this suit. But the City presents no evidence showing a lack of authorization, so this argument is entirely speculative. Moreover, the City presents no case law showing that a failure of corporate formalities implicates standing.

### B. *Standing for the Minor Permitting Provision*

We next assess Plaintiffs' standing as to the Minor Permitting Provision, which requires Solicitors under age 18 to solicit under the supervision of a permitted "sponsor." Plaintiffs assert Hall has standing to challenge this provision because her children fundraise door-to-door for 4-H clubs and scout troops and she "would like for [them] to be able to continue." The district court found no standing because it interpreted another portion of the Ordinance, found in the general Permitting Provision, to exempt temporary sales by children's organizations. But we do not reach this issue because we find, more fundamentally, standing is absent because there is no minor Plaintiff in the case.

As explained above, to have an injury sufficient to mount a constitutional challenge, a plaintiff must show an "intention to engage" in constitutionally protected conduct "arguably proscribed" by the challenged provision.[25] Here, the Minor Permitting Provision does not "arguably

---

913 F.3d 503, 506 (5th Cir. 2019). The case makes no categorical pronouncement banning 501(c)(4) corporations from political activity. *Id.*

[24] "An organization may carry on lawful political activities and remain exempt under section 501(c)(4) as long as it is primarily engaged in activities that promote social welfare." *Fed. Election Comm'n v. Beaumont*, 539 U.S. 146, 150 n.1 (2003) (cleaned up).

[25] These requirements are applicable to both facial and as-applied challenges. *See Speech First*, 979 F.3d at 331–32. So, to the extent Plaintiffs contend they can bypass these standing requirements as to their facial challenge to the Minor Permitting Provision, they are mistaken.

No. 24-50788

proscribe[]" Plaintiffs' speech because *Plaintiffs are not minors*, nor have they brought claims on behalf of a minor.[26] Because the Minor Permitting Provision in no way abridges Plaintiffs' intended speech, they lack standing to challenge that provision.

## III. Decisional Framework

Before turning to the merits in earnest, we summarize some foundational principles. First, we note our standard of review. Second, we set forth the preliminary-injunction standard and crucial burden-shifting scheme relevant to this appeal. Third, we explain that we review the district court's decision under the framework for as-applied challenges, rather than that for facial challenges.

### A. *Standard of Review*

"[T]he ultimate decision whether to grant or deny a preliminary injunction is reviewed only for abuse of discretion," but "a decision grounded in erroneous legal principles is reviewed de novo."[27] "As to each element of the district court's preliminary-injunction analysis, the district court's findings of fact are subject to a clearly-erroneous standard of review."[28]

### B. *The Preliminary Injunction Standard*

To obtain a preliminary injunction, a plaintiff must demonstrate four elements:

---

[26] *Stringer v. Whitley*, 942 F.3d 715, 720–21 (5th Cir. 2019) ("To be an injury in fact, a threatened future injury must be potentially suffered by the plaintiff, not someone else.").

[27] *Women's Med. Ctr. of Nw. Hou. v. Bell*, 248 F.3d 411, 419 (5th Cir. 2001).

[28] *Janvey v. Alguire*, 647 F.3d 585, 592 (5th Cir. 2011) (internal citations and quotation marks omitted).

> (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest.[29]

Usually, the plaintiff has the burden of proof on all elements.[30] But in the First Amendment context, the burden on the first element shifts to the defendant. This is because "the burdens at the preliminary injunction stage track the burdens at trial"[31] and the government bears the ultimate burden to show the constitutionality of a speech-restrictive law.[32] Thus, to show a substantial likelihood of success, the plaintiff has the initial burden to "demonstrate[] that the government is infringing her speech."[33] If she does so, then "she has presumptively carried her burden at this stage of the litigation."[34] The burden then shifts to the government to "rebut th[e] presumption"[35] by "show[ing] its ability to justify the statutes' constitutionality."[36]

---

[29] *Siders v. City of Brandon*, 123 F.4th 293, 300 (5th Cir. 2024).

[30] *Id.*

[31] *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006).

[32] *See United States v. Playboy Entm't Grp.*, 529 U.S. 803, 816 (2000).

[33] *Siders*, 123 F.4th at 301.

[34] *Id.*

[35] *Id.*

[36] *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009) ("Thus, when considering the likelihood of success, the district court should have inquired whether there is a sufficient likelihood the State will ultimately fail to prove its regulation constitutional.").

No. 24-50788

Here, no one disputes that the Hours, Signs, Streets and Permitting Provisions infringe upon Plaintiffs' speech. Accordingly, when analyzing the substantial-likelihood-of-success factor, we ask whether the City carried its burden by showing its "ability to justify" the individual provisions under the applicable level of scrutiny.[37]

C. *The Facial vs. As-Applied Distinction*

At this point, the distinction between facial and as-applied challenges as related to the scope of our review comes into play. This area of law is murky: "confusion abounds" over the attributes and analysis necessary for each type of challenge.[38] Nevertheless, some things are clear. First, in a facial challenge, the court considers the entire range of the statute's applications and determines its constitutionality as to hypothetical parties not before the court.[39] But in an as-applied challenge, the court confines its analysis to the statute's constitutionality as to the particular plaintiff.[40] Second, successful

---

[37] *Id.* The City also argues that the district court erred by twice using the term "likelihood of success" when analyzing the first factor rather than "*substantial* likelihood of success." This argument is meritless, as the district court repeatedly used and applied the correct terminology. Even if we were to assume an error in the legal standard, our de novo review remedies it.

[38] *Justice v. Hosemann*, 771 F.3d 285, 292 (5th Cir. 2014); *see also* Alex Kreit, *Making Sense of Facial and As-Applied Challenges*, 18 Wm. & Mary Bill Rts. J. 657, 658 (2010) ("[S]ome of the most basic details regarding the characteristics of the facial and as-applied challenges categories and, in particular, how the preference for as-applied challenges actually operates, remain surprisingly unclear.").

[39] *See Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) ("The first step in the proper facial analysis is to assess the state laws' scope. What activities, by what actors, do the laws prohibit or otherwise regulate? . . . The next order of business is to decide which of the laws' applications violate the First Amendment, and to measure them against the rest.").

[40] *See Reed v. Goertz*, 136 F.4th 535, 542 (5th Cir. 2025) ("In adjudicating [Plaintiff's] as-applied challenge, we consider the particularities of his circumstances to determine whether [the statute] can be constitutionally applied to him." (cleaned up)).

facial challenges invalidate the regulation altogether, whereas successful as-applied challenges result in injunctions that protect only the plaintiff.[41] Third, given the broader scope of facial challenges, as-applied challenges are the preferred method of constitutional adjudication.[42] With these guideposts, it is well-settled in this Circuit that "[w]hen a litigant brings both as-applied and facial challenges, [courts] generally decide the as-applied challenge first."[43] "Only if it is determined that the statute would be valid as applied" to the plaintiff does the court "proceed to an overbreadth issue" and analyze the facial challenge.[44]

The district court conflated Plaintiffs' facial and as-applied challenges when assessing Plaintiffs' likelihood of success on the merits. On the one hand, it treated Plaintiffs' challenges as as-applied by confining its analysis to the Ordinance's impact on Plaintiffs only, not on hypothetical other parties. On the other hand, the court at times relied on cases addressing facial challenges and ultimately entered facial relief—a total injunction—as to the Permitting Provision.

Regardless, and consistent with our case law, we review the district court's order in the context of Plaintiffs' as-applied challenge. We have

---

[41] *See Moody,* 603 U.S. at 758, 756 ("[A] successful as-applied challenge only prevents application of the statute against that plaintiff. . . . With a facial challenge, however, a plaintiff seeks to enjoin every application of a statute.") (Thomas, J., concurring).

[42] *See id.* at 723 (explaining that as-applied challenges are preferred because "facial challenges threaten to short circuit the democratic process").

[43] *Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019); *see also Serafine v. Branaman*, 810 F.3d 354, 363 (5th Cir. 2016).

[44] *Buchanan*, 919 F.3d at 854. At oral argument, the City posited that this approach is used only in criminal cases, but this argument is unsupported by the case law. *See id.* (applying this process in a civil case); *Serafine*, 810 F.3d at 363 (same).

previously used this approach when faced with an unclear record.[45] Further, this approach gives effect to the rule that courts should consider an as-applied challenge first and move on to consider a facial challenge only if the challenged law is valid as applied to the plaintiff.[46] As explained more fully below, we do not find any of the provisions are likely "valid" as-applied to Plaintiffs: we either find them likely invalid or remand for further analysis. We therefore never reach Plaintiffs' facial challenges. So, although the City spends a good deal of its brief arguing that the district court failed to properly apply the framework for facial challenges laid out in *Moody v. NetChoice LLC*,[47] this argument is misplaced.

## IV. The Merits

Plaintiffs challenge the Ordinance as a violation of their First Amendment right to free speech. The district court found that Plaintiffs did not have a substantial likelihood of success on their challenges to the Hours, Signs, and Streets Provisions, such that a preliminary injunction was not warranted. But it found that Plaintiffs could show a substantial likelihood of success, as well as the three other preliminary-injunction factors, in their challenge to the Permitting Provision. We summarize the law applicable to First Amendment challenges before examining the district court's holdings as to each provision.

---

[45] *See Siders*, 123 F.4th at 301 n.6 ("As we shall explain, there is inconsistent language used below and on appeal to characterize [Plaintiff's] constitutional challenge. We conduct our analysis as though [Plaintiff] brings an as-applied challenge.").

[46] *See Buchanan*, 919 F.3d at 852.

[47] *See* 603 U.S. at 723 (explaining the process for evaluating facial challenges).

No. 24-50788

A. *The First-Amendment Analysis*

The first step in an as-applied First Amendment challenge is to determine whether the plaintiff's speech is constitutionally protected at all.[48] We have already performed this analysis for our standing inquiry. The City does not dispute that Plaintiffs' intended conduct—political canvassing, street evangelism, charitable solicitation, and commercial solicitation—is protected speech.

Next, we usually determine what level of scrutiny applies to the law in question. "For a First Amendment challenge, the appropriate level of scrutiny depends on whether the [o]rdinance is content-based or content-neutral."[49] "If content-based, the [o]rdinance is 'presumptively unconstitutional' and must survive strict scrutiny."[50] Strict scrutiny "requires a restriction to be the least restrictive means of achieving a compelling governmental interest" and "is the most demanding test known to constitutional law."[51] Alternatively, if the ordinance is content-neutral, intermediate scrutiny applies.[52] Intermediate scrutiny is a lower, though still demanding, standard:  the restriction must be "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."[53]

---

[48] *Siders*, 123 F.4th at 302.

[49] *Nat'l Fed'n of the Blind of Tex., Inc. v. City of Arlington*, 109 F.4th 728, 734 (5th Cir. 2024).

[50] *Id.* (quoting *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015)).

[51] *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 484 (2025) (internal quotations omitted) ("In the First Amendment context, we have held only once that a law triggered but satisfied strict scrutiny.").

[52] *Id.*

[53] *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983).

Because the applicable level of scrutiny depends on whether the law is content-based or content-neutral, this distinction is often key. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."[54] The Supreme Court has explained that "defining regulated speech by a particular subject matter" is an "obvious" content-based distinction.[55]

The district court found all four provisions of the Ordinance content-neutral and thus subject to intermediate scrutiny. Plaintiffs contend on appeal that the Ordinance's definitions of "Canvassing" and "Soliciting" render the provisions content-based and subject to strict scrutiny. Plaintiffs further argue that the City failed to meet its burden to justify the provisions even assuming the Ordinance is content-neutral and subject to intermediate scrutiny. We assess these arguments in turn.

B. *The Canvassing Definition and the Hours and Signs Provisions*

The Hours and Signs Provisions limit the permissible times and locations for "Canvassing." These two provisions present an easy case because the definition of "Canvassing" is blatantly content-based. That is, "Canvassing" is defined as "attempting to enlist support for or against a particular *religion, philosophy, ideology, political party, issue, or candidate*." Because the definition regulates speech regarding these six particular subjects, but no others, it creates exactly the type of "topic" based distinction that warrants strict scrutiny.[56] For example, someone attempting to "enlist support" for a yoga group, or to extend an invitation to a book-club meeting, would be free to ring doorbells at any hour and at homes bearing

---

[54] *Reed*, 576 U.S. at 163.

[55] *Id.*

[56] *Reed*, 576 U.S. at 163.

prohibitory signs under the provisions. But Plaintiffs, who wish to enlist support for political candidates and spread religious messages, are restricted from such conduct because of the content of their speech. The district court incorrectly treated the Hours and Signs Provisions as content-neutral and erred in applying intermediate scrutiny rather than strict.

Although we find the Hours and Signs Provisions are content-based and must be subject to strict scrutiny, we in no way suggest that prohibitions on door-knocking at certain times or in violation of prohibitory signage are *never* constitutional. There is no way it could be argued, for example, that a salesman or a missionary has an unlimited First Amendment right to knock on doors at 3:00 a.m. and startle residents awake.[57] "Municipalities have a significant interest in protecting the well-being, tranquility, and privacy of the home."[58] Although successful examples are rare even under intermediate scrutiny,[59] at least one court has upheld a content-neutral curfew on door-to-door activity where the government met its burden.[60]

---

[57] *Wis. Action Coal.*, 767 F.2d at 1258 ("A municipality's interest in protecting the peaceful enjoyment of the home may well be sufficiently great at 9:00 p.m., not to mention 3:00 a.m., to support the Ordinance.").

[58] *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 572 (6th Cir. 2012).

[59] *See, e.g.*, *id.* at 576 ("[T]he City has failed to demonstrate that the curfew on door-to-door canvassing is narrowly tailored."); *Wis. Action Coal.*, 767 F.2d at 1257 ("Indeed, the City did not present any evidence at all that the Ordinance would further the City's legitimate interests in protecting privacy and peaceful enjoyment of the home."); *Aptive Env't, LLC*, 959 F.3d at 991 ("Castle Rock has failed to demonstrate that the Curfew directly advances in a material way its substantial interest in public safety.").

[60] *See Penn. All. for Jobs & Energy v. Council of Borough of Munhall*, 743 F.2d 182, 187 (3d Cir. 1984) (holding that the government had sufficiently justified a content-neutral hours limit on canvassing and solicitation).

No. 24-50788

C. *The "Soliciting" Definition*

The remaining two provisions—the Streets and Permitting Provisions—regulate "Soliciting." Whereas the "Canvassing" definition is clearly content-based, the "Soliciting" definition presents a much closer question. The Supreme Court has recently re-affirmed that bans on solicitation—defined as "speech requesting or seeking to obtain something or an attempt or effort to gain business"—are not content-based "so long as they do not discriminate based on topic, subject matter, or viewpoint."[61] Thus, the Court favorably cited prior decisions upholding bans that "applied evenhandedly to all who wished to solicit funds, whether for commercial or charitable reasons."[62] The difficulty, however, is that the City's definition of "Soliciting" is broader than this.

The definition starts off with a content-neutral focus on monetary transactions: "Soliciting" includes "requesting a contribution of funds or anything of value or selling goods or services." But the last sentence reads: "Distributing a handbill or flyer . . . *advertising services for educational, political, charitable, religious, or other purposes,* is considered a "solicitor.'" Because of the inclusion of the catch-all phrase "or other purposes," the sentence could be read to simply include *all* advertisements for the performance of services, which seems both neutral and commercially focused. But on the other hand, as the district court recognized, the language could also be read to "capture[] religious and political speech." For example, a person distributing a flyer inviting the recipient to a church service is seemingly "advertising services" for "religious purposes" and thus could be

---

[61] *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 72 (2022).

[62] *Id.* (cleaned up) (describing *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981)).

a regulated Solicitor. That falls far outside the bounds of the Supreme Court's commercially-focused definition. It also veers into content-based distinction, as the applicability of the regulation turns on the message conveyed in the flyer.

Ultimately, we need not decide whether the "Soliciting" definition is content-based. As explained below, even under the lower intermediate-scrutiny standard, the City fell short of justifying the Streets and Permitting Provisions. Accordingly, we see no reason to wade into murky waters to decide whether the "Soliciting" definition renders these provisions content-based.[63] Rather, we explain that the City failed to meet its burden even under intermediate scrutiny.

### D. *The Streets Provision*

The Streets Provision prohibits Soliciting in the streets, street rights-of-way, and medians of the City. Citing case law upholding similar prohibitions, the district court found the City likely met intermediate scrutiny. We disagree.

"While not as exacting as strict scrutiny, intermediate scrutiny is no gimme for the government . . . the burden of justification is demanding."[64] *First*, the government must articulate an "important" or "significant"

---

[63] *See Hines v. Pardue*, 117 F.4th 769, 778–79 (5th Cir. 2024) ("[C]ontent neutrality is far from clear. . . . These questions do not need a definitive answer today, however, because the law cannot withstand even intermediate scrutiny—the lowest tier of scrutiny available for our analysis based on the facts in this case. Accordingly, we assume without deciding that the law regulates [Plaintiff's] speech in a content-neutral manner, meaning we apply intermediate rather than strict scrutiny."); *Bruni v. City of Pittsburgh*, 824 F.3d 353, 364 (3d Cir. 2016) (same).

[64] *Hines*, 117 F.4th at 779.

governmental interest for the restriction.[65] *Second*, it must show that the selected method of regulation is "narrowly tailored" to meet this interest.[66] True, the government's burden is lower at the preliminary-injunction stage than at a final trial on the merits. But the government still has the burden of "show[ing]" its "ability to justify" the regulation.[67] Here, the City failed to make this showing because it presented no evidence whatsoever.

### 1. *Important Governmental Interest*

When the Government defends a law under intermediate scrutiny, "as a means to redress past harms or prevent anticipated harms . . . it must demonstrate that the recited harms are real, not merely conjectural."[68] Crucially, "the justification must be genuine, not hypothesized or invented post hoc in response to litigation."[69] At an evidentiary hearing before the district court, counsel for the City articulated "guarding against traffic accidents" as the justification for the Streets Provision. Protecting pedestrians and preventing accidents may indeed qualify as important government interests.[70]

Although the City invoked traffic safety during this litigation, it has not shown this interest is "real, not merely conjectural."[71] Quite the

---

[65] *Id.*

[66] *Id.*

[67] *Byrum*, 566 F.3d at 446.

[68] *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994) (internal citations omitted).

[69] *United States v. Virginia*, 518 U.S. 515, 533 (1996).

[70] *See Int'l Soc'y for Krishna Consciousness of New Orleans, Inc. v. City of Baton Rouge*, 876 F.2d 494, 498 (5th Cir. 1989); *Hou. Chron. Publ'g Co.*, 488 F.3d at 621.

[71] *Id.*

opposite: the City admits it was not addressing an "actual problem" in enacting the Speech Provision.[72] At the preliminary-injunction hearing, the district court asked counsel for the City: "Is there any evidence in the record here that the City had issues in the streets that's requiring this?" to which counsel replied, "The short answer is, no."

In addition, the preamble of the Ordinance does not cite any interest in traffic safety. Rather, it repeatedly states that the purpose of the Ordinance is to assist citizens in "preserving their privacy," "avoiding petty annoyances," and minimizing "unwelcome disturbance." As such, the only record evidence suggests that the City's concern about "petty annoyances" motivated this provision, not the safety of solicitors. Distinguishably, in cases where traffic safety was found to be a sincere and sufficient governmental interest, the defendant was able to point to evidence supporting its genuine purpose in preventing traffic accidents.[73] There is nothing comparable in this record.

---

[72] *See Klein v. City of San Clemente*, 584 F.3d 1196, 1202–03 (9th Cir. 2009) (finding that the plaintiff had a likelihood of success on their First Amendment challenge at the preliminary-injunction stage because the government presented no "evidence of an actual problem").

[73] *See Int'l Soc'y for Krishna Consciousness*, 876 F.2d at 498 ("The preamble of the ordinance noted that the soliciting practice 'has been identified as unsafe for both the person engaged in the solicitation and for traffic in general' and that 'this activity has in the past resulted in accidents one of which resulted from the death of the person engaged in the soliciting activity.'"); *Hou. Chron. Publ'g Co.*, 488 F.3d at 621 ("[T]he City maintain[s] its content-neutral purpose is one of public safety: to prohibit the dangerous activity of solicitors' entering busy traffic intersections. Toward this end, the City demonstrated at trial that newspaper street-vendors in nearby cities had been seriously injured at intersections similar to FM 518/I-45."); *Reynolds v. Middleton*, 779 F.3d 222, 224 (4th Cir. 2015) (evidence showed that the police chief proposed enacting an ordinance banning roadside solicitations based on his concern for pedestrian safety).

2. *Narrow Tailoring*

Moreover, even if the City had shown a genuine interest in traffic safety, it has not shown it will likely be able to demonstrate that the Streets Provision is narrowly tailored to meet that interest. In *McCullen v. Coakley*, the Supreme Court took an exacting view of what the government must present to establish narrow tailoring.[74] There, the state created a 35-foot "buffer zone" around abortion clinics to prevent disruptive conduct.[75] Because the statute substantially burdened speech in a public forum—it prevented people from standing in "public streets" and sidewalks[76]—the court required the state to "show[] that it seriously undertook to address the problem with less intrusive tools readily available to it."[77] It failed because, the Court explained, the government made no showing that it had considered less speech-restrictive measures to prevent the unsafe and harassing conduct it was concerned about, such as existing anti-obstruction ordinances, criminal enforcement, and more targeted injunctions.[78] Overall, our sister circuits have interpreted *McCullen* as "an important clarification of the rigorous and fact-intensive nature of intermediate scrutiny's narrow-tailoring analysis."[79]

Here, the City has presented *no evidence* suggesting it will likely be able to prove the Streets Provision is narrowly tailored. It has not even alleged that it considered other alternatives for protecting roadside solicitors beyond a

---

[74] *See* 573 U.S. 464, 471 (2014).

[75] *Id.* at 471.

[76] *Id.* at 477 ("Consistent with the traditionally open character of public streets and sidewalks, we have held that the government's ability to restrict speech in such locations is 'very limited.'").

[77] *Id.* at 494.

[78] *Id.* at 490–96.

[79] *Bruni*, 824 F.3d at 372.

complete ban.[80] Rather, the City and the district court relied only on case law in which roadside solicitation bans were upheld, primarily our decision in *International Society for Krishna Consciousness of New Orleans, Inc. v. City of Baton Rouge*.[81] As a threshold matter, it is not clear that the City can meet its burden by citation to case law alone; at least one circuit court has rejected this possibility in the wake of *McCullen*.[82] Moreover, *Krishna Consciousness* is distinguishable. Most crucially, the government there presented city-specific record evidence showing that less-restrictive alternatives would not protect solicitors given the topography of the roadsides in question.[83] Similar evidence is absent here. And as further evidence of narrow tailoring, the court in *Krishna Consciousness* heavily relied on the fact that distribution of literature, which did not present the same traffic dangers, was *not* banned by

---

[80] *See Reynolds*, 779 F.3d at 231 ("The Amended Ordinance applies to all County roads, regardless of location or traffic volume, and includes all medians, even wide medians and those beside traffic lights and stop signs. The Ordinance thus prohibits *all* roadside leafletting and solicitation, even where those activities would not be dangerous. The County's evidence, however, established, at most, a problem with roadway solicitation at busy intersections in the west end of the county. Given the absence of evidence of a county-wide problem, the county-wide sweep of the Amended Ordinance burdens more speech than necessary.").

[81] 876 F.2d at 494.

[82] *See Reynolds*, 779 F.3d at 228 ("[T]he Supreme Court's recent decision in *McCullen v. Coakley* clarifies what is necessary to carry the government's burden of proof under intermediate scrutiny. . . . intermediate scrutiny does indeed require the government to present actual evidence supporting its assertion that a speech restriction does not burden substantially more speech than necessary; argument unsupported by the evidence will not suffice to carry the government's burden.").

[83] *Krishna Consciousness*, 876 F.2d at 498 ("The city traffic engineer testified that while solicitations are most hazardous during peak hours on major routes, solicitations on other routes carry other hazards, e.g., no sidewalks, narrow shoulders, open drainage ditches. . . . evidence supports the district court's conclusion that 'there is no way that such activities can be made safe.'"); *see also Hou. Chron. Publ'g Co.*, 488 F.3d at 622 (finding sufficient narrow tailoring in a facial case where the Ordinance only prohibited roadway solicitation at certain high-traffic intersections).

the Ordinance.[84] But here, the opposite is true: distribution of some literature is indeed prohibited depending on what it says. *Krishna Consciousness* thus highlights the main problems with the City's presentation and is distinguishable for that reason.

E. *The Permitting Provision*

Next, we turn to the Permitting Provision, which requires Solicitors to obtain permits by undergoing background checks and fingerprinting. Applying intermediate scrutiny, the district court found that the City failed to show the Permitting Provision is narrowly tailored.[85] It therefore found that Plaintiffs have a substantial likelihood of success on the merits, and further found they satisfied the remaining preliminary-injunction factors. It then enjoined the City from enforcing the Permitting Provision. We again assume without deciding that the district court correctly applied intermediate scrutiny rather than strict. Applying that standard, we agree with the district court that the City failed to demonstrate narrow tailoring. But, although we agree that Plaintiffs are entitled to an injunction, the one entered by the district court is overbroad.

---

[84] 876 F.2d at 498–99 ("Direct communication of ideas, including the distribution of literature to occupants in vehicles, is not restricted. . . . Unlike oral advocacy of ideas, or even the distribution of literature, successful solicitation requires the individual to respond by searching for currency and passing it along.") (internal quotation marks omitted).

[85] The district court also mixed in some facial analysis when assessing the Permitting Provision. For example, it discussed the overbreadth of the provision, an analysis more suited to facial challenges. As explained above, we do not reach Plaintiffs' facial challenge and so do not review these findings. Instead, we review the district court's finding that the City failed to show narrow tailoring, which is equally crucial to the as-applied challenge we are considering. *See Bucklew v. Precythe*, 587 U.S. 119, 138 (2019) ("[C]lassifying a lawsuit as facial or as-applied . . . does not speak at all to the substantive rule of law necessary to establish a constitutional violation.").

### 1. *Important Governmental Interest*

As explained, to survive intermediate scrutiny, a government must show an important actual justification for even a content-neutral regulation. Here, the City articulates protection of privacy and prevention of crime. These can be important interests.[86] Moreover, unlike the situation as to the Streets Provision, here the City has some support in the record for the authenticity of these interests. That is, the preamble states the Ordinance is intended to "protect against criminal activity, including fraud and burglary, minimize the unwelcome disturbance of citizens and the disruption of privacy." At this stage, this language is sufficient to show that the City had an actual, not hypothetical, intention of furthering these goals.

### 2. *Narrow Tailoring*

But as the district court observed, the City fails at the narrow-tailoring step. Again, it presented no evidence of narrow tailoring, a failure which alone may be fatal even at this early stage.[87] Moreover, it presented no *argument* on narrow tailoring to the district court. In its opposition brief to Plaintiffs' motion for a preliminary injunction and at the hearing before the district court, the City only addressed its justification for the provision. It never argued that the Permitting Provision is narrowly tailored.

For the first time at oral argument before this Court, the City argued that it narrowly tailored the Permitting Provision because it attempted to exempt political and religious "Canvassers" from regulation and to reach only commercial speech. In making this argument, the City relies on dicta

---

[86] *See Watchtower Bible and Tract Soc'y, Inc., v. Village of Stratton.*, 536 U.S. 150, 165 (2002).

[87] *See Reynolds,* 779 F.3d at 228.

from *Watchtower Bible and Tract Society, Inc., v. Village of Stratton.*[88] There, the Supreme Court found that a door-to-door permitting requirement that reached political and religious speakers was "not tailored" to the government's interests in preventing fraud and crime and protecting privacy.[89] But it also observed that "[h]ad this provision been construed to apply only to commercial activities and the solicitation of funds"—rather than also reaching political and religious speech—it arguably would have been tailored to prevent fraud.[90] The City contends it tried to abide by this guidance by making the Permitting Provision applicable only to Solicitors.

This argument fails for many reasons. Preliminarily, we do not generally consider arguments not presented to the district court, let alone those that emerge for the first time at oral argument.[91] But even if we reach the merits of the argument, it is unpersuasive. Most fundamentally, the Permitting Provision reaches beyond mere commercial speech.[92] As discussed above, it reaches some political and religious speech by way of the broad "Soliciting" definition, which captures "advertising services" for religious and political purposes. Because the *Watchtower* Court held that a similar regulation capturing religious and political speech was not narrowly tailored to prevent fraud, that case *contradicts*, rather than supports, the City's position.[93]

---

[88] 536 U.S. at 165.

[89] *Id.* at 168.

[90] *Id.* at 165.

[91] *Jackson v. Gautreaux*, 3 F.4th 182, 188 (5th Cir. 2021) ("As we've repeatedly and emphatically held, we cannot and will not consider arguments raised for the first time at oral argument.").

[92] 536 U.S. at 168.

[93] *Id.*

No. 24-50788

As to the City's other interests of privacy and crime prevention, *Watchtower* favors Plaintiffs here too. The *Watchtower* Court concluded that tailoring was absent for the crime interest because "there is an absence of any evidence of a special crime problem related to door-to-door solicitation in the record before us."[94] Further, it observed that "it seems unlikely that the absence of a permit would preclude criminals from knocking on doors."[95] And as to the privacy interest, the Court observed that "[t]he annoyance caused by an uninvited knock on the front door is the same whether or not the visitor is armed with a permit."[96] The same reasoning appears true here, and the City does not distinguish these holdings.

### 3. *The Remaining Injunction Factors*

The City does not challenge the district court's application of the remaining injunction factors on appeal. We further find that the district court properly found that these factors weigh in favor of Plaintiffs.[97]

### 4. *The Scope of the Injunction*

Although we agree with the district court that Plaintiffs are entitled to an injunction, our decision is limited to their as-applied challenge. We therefore find that the district court erred by entering an injunction *completely*

---

[94] *Id.* at 169.

[95] *Id.*

[96] *Id.*

[97] *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion))); *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) ("[I]njunctions protecting First Amendment freedoms are always in the public interest." (quoting *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006))).

banning the City from enforcing the Permitting Provision.[98] Instead, the injunction should correspond with an as-applied challenge by extending only so far as necessary to protect Plaintiffs.[99] Rather than modifying the injunction ourselves, we leave this to the district court on remand.[100]

## V. Conclusion

1. We AFFIRM the district court's holdings that (a) Hall and LIA have standing to challenge the Hours, Signs, Streets and Permitting Provisions, (b) Vickers has standing to challenge the Signs and Permitting Provisions, and (c) no Plaintiff has standing to challenge the Minor Permitting Provision.

2. We REVERSE the district court's conclusion that (a) Hall and LIA have not shown a substantial likelihood of success on the merits as to the Hours Provision and (b) Hall, LIA, and Vickers have not shown a substantial likelihood of success on the merits as to the Signs Provision. We REMAND for reconsideration of these questions under strict scrutiny. The court should consider Plaintiffs' likelihood of success for the as-applied challenge *first* and reach the facial challenge only if it determines that

---

[98] *Moody,* 603 U.S. at 758, 756 ("[A] successful as-applied challenge only prevents application of the statute against that plaintiff. . . . With a facial challenge, however, a plaintiff seeks to enjoin every application of a statute.") (Thomas, J., concurring).

[99] *Id.*

[100] *See Scott v. Schedler*, 826 F.3d 207, 214 (5th Cir. 2016) (per curiam) ("We also decline Schedler's invitation to modify the injunction ourselves. The district court is well-versed in the intricacies of this lawsuit and has not previously been tasked with modifying the injunction for specificity or breadth. Accordingly, we will remand this case to the district court for modification of the injunction in the first instance."); *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 582 (5th Cir. 2005) ("We [remand] this case back to the district court with instructions to modify the injunction consistent with this opinion.").

Plaintiffs do not have a likelihood of success in the as-applied context. Any injunction should correspond in scope.

3. We REVERSE the district court's conclusion that Hall and LIA do not have a substantial likelihood of success on the merits of their as-applied challenge to the Streets Provision. We REMAND to the district court to consider the remaining preliminary-injunction factors. Any injunction should extend in scope only so far as necessary to protect these Plaintiffs.

4. We AFFIRM the district court's holding that Hall, LIA, and Vickers have a substantial likelihood of success on the merits of their as-applied challenge to the Permitting Provision and are entitled to an injunction. But we VACATE the existing injunction as overbroad and REMAND to the district court to craft an injunction that extends only as far as necessary to protect Plaintiffs.

5. We DENY as moot Plaintiffs' motion for an injunction pending appeal.